UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
VICTOR MANNARINO,                                                                    **COMPLAINT**

                              Plaintiff,

                      -against-

INTER-CON SECURITY SYSTEMS, INC.

                              Defendant.
------------------------------------------------------------------X

       Plaintiff Victor Mannarino ("Plaintiff"), by his attorneys, Korder Law, for his complaint against Defendant Inter-Con Security Systems, Inc. ("Defendant") alleges the following:

## PRELIMINARY STATEMENT

       1.    Plaintiff brings this action against Defendant for disability discrimination pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"), and New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107, *et seq.* ("NYCHRL").

       2.    After more than two decades of distinguished service protecting the judiciary, staff, and public in the federal courts, Defendant unlawfully terminated Plaintiff on the basis of disability. Although Plaintiff had been diagnosed with heart disease and had a pacemaker implanted several years before Defendant terminated him, throughout his employment, he was able to, and actually did, perform the essential functions of the position that he held without a reasonable accommodation. Nonetheless, without any business or medical justification, Defendant subjected Plaintiff to unlawful medical examinations and inquiries and then, based on the results of those unlawful medical examinations and inquiries, unlawfully removed Plaintiff from duty and terminated him.

3. But for Defendant's unlawful termination of Plaintiff, he would still be protecting the judiciary, staff, and public in the federal courts. Because of Defendant's disability discrimination against him, Plaintiff has, *inter alia,* lost his union wages and benefits, been relegated to part-time minimum-wage employment, and suffered significant emotional distress.

## DEMAND FOR JURY TRIAL

4. Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a jury trial on all the issues so triable.

## THE PARTIES

5. Plaintiff is an individual residing at 7 Vahlsing Way, Robbinsville, NJ 08691.

6. Upon information and belief, Defendant is a California corporation with its principal place of business at 10 South De Lacey Avenue, Pasadena, CA 91105.

## JURISDICTION AND VENUE

7. Pursuant to 28 U.S.C. § 1331, this Court has federal-question jurisdiction over Plaintiff's claims pursuant to the ADA.

8. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's claims pursuant to the NYSHRL and NYCHRL.

9. Pursuant to 28 U.S.C. §§ 1332(a)(1), (c)(1), this Court has diversity jurisdiction because the matter in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00) exclusive of interest and costs, Plaintiff is a citizen of New Jersey, and Defendant is a citizen of California.

10. Pursuant to 28 U.S.C. § 1391(b)(2), the Eastern District of New York is the proper venue because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of New York.

**FACTUAL ALLEGATIONS**

11. Plaintiff was employed as a police officer for the New York City Police Department from around 1969, when he graduated from the Police Academy, to around 1990, when he retired.

12. Plaintiff's 21 years of experience in law enforcement, *inter alia,* made him well-suited to protect the judiciary, staff, and public in the federal courts.

13. For around 22 years, from around February 1, 1992 to around January 14, 2015, Plaintiff was employed as a Court Security Officer ("CSO") for the U.S. Marshals Service ("USMS") in the federal courts in the Second Circuit.

14. As a CSO, Plaintiff's job duties included, *inter alia,* monitoring points of ingress and egress to the courthouse, scanning and searching members of the public seeking access to the courthouse, monitoring security cameras, and providing security services during court proceedings.

15. Throughout Plaintiff's employment as a CSO for USMS, he never had any trouble performing any of his job duties.

16. Throughout Plaintiff's employment as a CSO for USMS, he never had any trouble exerting himself physically—e.g., running up multiple flights of stairs to quickly respond to alarms; even in non-emergencies, Plaintiff usually chose to use the stairs instead of the elevators to get exercise.

17. Throughout Plaintiff's employment as a CSO for USMS, he was never disciplined or counseled about his performance of his job duties.

18. Plaintiff is not aware of any complaints from anyone about his performance of his job duties at any time during his employment as a CSO.

19. Throughout Plaintiff's employment as a CSO for USMS, he was employed by various vendors that provide security services in the federal courts in the Second Circuit under contracts with USMS.

20. Upon information and belief, Defendant is "one of the largest security companies in the world, employing tens of thousands of individuals not only throughout the United States, but also across 20 countries and four continents" whose clients include "federal, state and local governments, multinational corporations, public utilities and high net worth individuals." *About Us,* Inter-Con Security, (March 6, 2020, 1:54 PM), https://www.icsecurity.com/about-us/.

21. From around October 2013 to the end of Plaintiff's employment as a CSO for USMS, Defendant was the vendor that provided security services in the federal courts in the Second Circuit under a contract with USMS.

22. From around October 2013 to the end of Plaintiff's employment as a CSO for USMS, Defendant was Plaintiff's employer.

23. During the period that Plaintiff was employed by Defendant, Plaintiff was assigned to the United States Bankruptcy Court for the Eastern District of New York.

24. Pursuant to the contracts between the various vendors that provide security services in the federal courts in the Second Circuit and USMS, each CSO was required to undergo a medical examination at the beginning of his employment and then annually throughout his employment.

25. Based on the results of the medical examinations, Federal Occupational Health ("FOH") may determine that the CSO is medically qualified or medically disqualified.

26. If, based on the results of the medical examinations, FOH is unable to determine that the CSO is medically qualified or medically disqualified, FOH may defer its determination

and request additional information and then, based on the additional information, determine that the CSO is medically qualified or medically disqualified.

27. From the beginning of his employment as a CSO through 2013, Plaintiff underwent the required medical examinations and was never removed from duty or medically disqualified.

28. In or around August 2008, Plaintiff was diagnosed with heart disease and had a pacemaker implanted.

29. Throughout his employment as a CSO for USMS, Plaintiff was cleared by his doctors to perform all of his job duties without any restrictions or accommodations.

30. Plaintiff's heart disease and pacemaker never affected his ability to perform any of his job duties at any time during his employment as a CSO for USMS.

31. On or around February 25, 2014, as required by Defendant pursuant to its contract with USMS, Plaintiff underwent his annual medical examination for 2014.

32. On or around July 21, 2014, based on the results of the February 25, 2014 annual medical examination, FOH deferred its determination and requested additional information.

33. FOH's decision to defer its determination was ostensibly based on premature ventricular contractions ("PVCs") during a resting electrocardiogram.

34. The additional information that FOH requested included, *inter alia,* the results of a Bruce protocol treadmill exercise stress test ("stress test").

35. On or around July 30, 2014, USMS advised Defendant of FOH's request for additional information, and Defendant requested the additional information from Plaintiff.

36. On or around August 7, 2014, Plaintiff took a stress test, the results of which were submitted to FOH, in which he reached 79% of his maximum predicted heart rate ("MPHR") and 7.5 metabolic equivalent of tasks ("METS").

37. On or around August 29, 2014, based on the results of the August 7, 2014 stress test, FOH again deferred its determination, again requested additional information, and recommended that Plaintiff be removed from duty.

38. The additional information that FOH requested included, *inter alia,* the results of another stress test.

39. On or around September 8, 2014, based on FOH's recommendation, USMS advised Defendant to remove Plaintiff from duty, and Defendant removed Plaintiff from duty without making any effort to evaluate or challenge FOH's recommendation.

40. On or around November 6, 2014, Plaintiff took a second stress test, in which he reached 91% of his MPHR and 5.6 METS.

41. On or around November 25, 2014, apparently before the results of the November 6, 2014 stress test were submitted to FOH, FOH determined that Plaintiff was conditionally medically qualified, recommended that Plaintiff be returned to full and unrestricted duty, and again requested additional information, including, *inter alia,* the results of another stress test.

42. On or around December 1, 2014, based on FOH's recommendation, USMS advised Defendant to return Plaintiff to full and unrestricted duty, and Defendant returned Plaintiff to full and unrestricted duty.

43. Upon information and belief, Defendant would not have returned Plaintiff to full and unrestricted duty if it believed that he posed a danger to himself or anyone else or was otherwise unable to perform the essential functions of the CSO position.

44. On or around December 11, 2014, Plaintiff took a third stress test, in which he reached 71% of his MPHR and 9.3 METS.

45. On or around December 17, 2014, Plaintiff took a fourth stress test, in which he reached 82% of his MPHR and 10.0 METS.

46. On or before December 17, 2014, the results of the November 6, 2014, December 11, 2014, and December 17, 2014 stress tests were submitted to FOH.

47. On or around January 12, 2015, based on the results of the November 6, 2014, December 11, 2014, and December 17, 2014 stress tests, FOH again deferred its determination, again requested additional information, and again recommended that Plaintiff be removed from duty.

48. On or around January 14, 2015, based on FOH's recommendation, USMS advised Defendant to again remove Plaintiff from duty, and Defendant again removed Plaintiff from duty without making any effort to evaluate or challenge FOH's recommendation.

49. From around December 1, 2014, when Defendant returned Plaintiff to full and unrestricted duty, to around January 14, 2015, when Defendant again removed Plaintiff from duty, Plaintiff continued to perform his job duties without any trouble, restrictions, or accommodations.

50. On or around January 18, 2015, additional information was submitted to FOH; the additional information included but was not limited to a letter from Plaintiff's treating cardiologist, which stated, *inter alia,* that Plaintiff had reached a level of 10.1 METS on a stress test and was capable of physical exertion.

51. On or around February 3, 2015, notwithstanding the additional information that was submitted to FOH on or around January 18, 2015, FOH determined that Plaintiff was not medically qualified.

52. The basis of FOH's determination that Plaintiff was not medically qualified was ostensibly his failure to reach 100% of his MPHR and/or 10 METS on one or more of the stress tests, which, according to the Judicial Security Division Medical Review Form dated January 18, 2015, ostensibly demonstrated an "inability to perform the essential functions of the job (e.g., running in pursuit and then subduing an individual, dragging a colleague or victim out of harm's way, or running up 2-3 flights of stairs in an emergency)" and "poses an elevated risk to safety for himself, his colleagues, the judges, and the public."

53. On or around February 5, 2015, based on FOH's determination, USMS advised Defendant that Plaintiff was not medically qualified, and Defendant terminated Plaintiff without making any effort to evaluate or challenge FOH's determination.

54. Each time that USMS advised Defendant of FOH's determinations, recommendations, and requests as to Plaintiff, USMS invited Defendant to contact them with any questions or concerns.

55. Upon information and belief, Defendant never contacted USMS with any questions or concerns about FOH's determinations, recommendations, and requests as to Plaintiff.

56. Upon information and belief, throughout the medical review process, USMS welcomed input from Defendant about FOH's determinations, recommendations, and requests as to Plaintiff.

57. Upon information and belief, Defendant never made any effort to evaluate or challenge FOH's determinations, recommendations, and requests as to Plaintiff, effectively delegating the medical review process to USMS and blindly implementing USMS's decisions.

58. Upon information and belief, there was no medical indication for stress testing based on the results of the February 25, 2014 annual medical examination, including the PVCs during a resting electrocardiogram.

59. Upon information and belief, the "rule-out" diagnosis for PVCs during a resting electrocardiogram is ischemia, which was ruled out for Plaintiff by a diagnostic method other than stress testing, and for which stress testing is not a reliable diagnostic method.

60. Upon information and belief, stress testing is not a reliable predictor of the risk of sudden incapacitation or death due to a cardiac event during exercise, and, in any event, such risk is extremely low, even for individuals with heart disease.

61. Upon information and belief, stress testing is not a reliable predictor of a CSO's ability to perform his job duties; on the contrary, the most reliable method of evaluating a CSO's ability to perform his job duties is day-to-day observation of the CSO over a long period of time.

62. Upon information and belief, Defendant did not require all CSOs to take stress tests, and Defendant did not use stress tests to screen CSOs for general physical fitness unrelated to a specific medical condition—i.e., reaching certain levels on a stress test was not an essential function of the CSO position.

63. Upon information and belief, the MPHR is not a reliable predictor of an individual's exercise capacity.

64. Upon information and belief, there is no support in medical literature for FOH's assertion that the job duties of a CSO require a level of 10.0 METS.

65. Upon information and belief, a level of 3.0 to 6.0 METS, which Plaintiff reached on all four of the stress tests, is required for activities such as bicycling at 5 to 9 miles per hour with hills, weight training and body building, downhill skiing, shoveling, and occupations that require extended periods of walking, pushing or pulling objects weighing 75 pounds, lifting 50 pounds, and walking while carrying 50 pounds.

66. Upon information and belief, a level of greater than 6.0 METS, which Plaintiff reached on three of the four stress tests, is required for activities such as running, mountain climbing, rock climbing, rappelling, bicycling at more than 10 miles per hour with steep hills, push-ups, pull-ups, boxing, wrestling, competitive sports, digging ditches, and occupations that require extensive periods of running, rapid movement, pushing or pulling objects weighing more than 75 pounds, and running up a flight of stairs carrying more than 25 pounds, such as firefighting, construction, and coal mining.

67. Upon information and belief, a level of 10.0 METS, which Plaintiff was required to reach—and which Plaintiff did reach on one of the four stress tests—is required for activities such as firefighters breaking down walls while wearing full gear or climbing stairs or hills while carrying 50 to 74 pounds.

68. Upon information and belief, the results of all four of the stress tests, Plaintiff's other medical records from the period of February 25, 2014 to February 3, 2015, and Defendant's decision to return Plaintiff to full and unrestricted duty on December 1, 2014 demonstrate that he was able to perform the essential functions of the CSO position without a reasonable accommodation.

69. Upon information and belief, there was no support in Plaintiff's medical records nor medical literature for Defendant's decisions to require Plaintiff to submit additional

information about his disability and take multiple stress tests, remove Plaintiff from duty on September 8, 2014, again remove Plaintiff from duty on January 14, 2015, and terminate Plaintiff on February 3, 2015.

70. Because of Defendant's actions, Plaintiff has suffered monetary damages, including but not limited to lost wages and benefits.

71. Because of Defendant's actions, Plaintiff has suffered significant emotional distress, including but not limited to depression, dejection, weight gain, shock at the loss of his employment after working for his entire adult life, stress due to a lack of discretionary income and credit card debt, and anxiety due to the difficulty of finding new employment in his late 60s/early 70s.

**FIRST CAUSE OF ACTION**
**Disability Discrimination Pursuant to the ADA**

72. All preceding paragraphs are incorporated herein by reference.

73. On or around July 19, 2015, Plaintiff filed a Charge of Discrimination, alleging discrimination based on disability, with the U.S. Equal Employment Opportunity Commission ("EEOC").

74. On October 24, 2019, after an investigation, the EEOC issued a determination of reasonable cause.

75. On March 12, 2020, after a failed conciliation effort, the EEOC issued a Notice of Right to Sue.

76. Plaintiff is an individual with a "disability" as defined in 42 U.S.C. § 12102. Plaintiff has heart disease, which is a physical impairment that substantially limits circulatory function, which is a major bodily function and major life activity as defined in 42 U.S.C. §§ 12102(1)(A), (2), and a record of such impairment as defined in 42 U.S.C. § 12102(1)(B).

Alternatively, Defendant regarded Plaintiff as having a physical impairment as defined in 42 U.S.C. §§ 12102(1)(A), (3).

77. Plaintiff is an "employee" as defined in 42 U.S.C. § 12111(4).

78. Defendant is a "covered entity" as defined in 42 U.S.C. § 12111(2).

79. Defendant is an "employer" as defined in 42 U.S.C. § 12111(5).

80. Plaintiff is a "qualified individual" as defined in 42 U.S.C. § 12111(8); he could perform the essential functions of the CSO position without a reasonable accommodation.

81. Pursuant to 42 U.S.C. § 12112, Defendant was prohibited from discriminating against Plaintiff because of his disability.

82. By, *inter alia,* removing Plaintiff from duty because of his disability and terminating Plaintiff because of his disability, Defendant discriminated against Plaintiff on the basis of disability in violation of 42 U.S.C. § 12112(a).

83. By, *inter alia,* requiring Plaintiff to submit additional information about his disability and take multiple stress tests, Defendant utilized standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability in violation of 42 U.S.C. § 12112(b)(3)(A), used qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities and which were not job-related for the position in question nor consistent with business necessity in violation of 42 U.S.C. § 12112(b)(6), and required medical examinations and made inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability which were not job-related for the position in question nor consistent with business necessity in violation of 42 U.S.C. §§ 12112(d)(1), (4).

84. Insofar as Defendant acted pursuant to its contract with USMS, Defendant participated in a contractual or other arrangement or relationship that had the effect of subjecting Plaintiff to discrimination on the basis of disability in violation of 42 U.S.C. § 12112(b)(2).

85. Because Defendant discriminated against Plaintiff on the basis of disability, pursuant to 42 U.S.C. §§ 12117(a), 2000e-5(g), 1981a(a)(2), Defendant is liable to Plaintiff for back pay, front pay, and compensatory damages, and pursuant to 42 U.S.C. § 12205, Defendant is liable to Plaintiff for attorney's fees and costs.

86. Because Defendant discriminated against Plaintiff on the basis of disability with malice or reckless indifference to his federally protected rights, pursuant to 42 U.S.C. §§ 12117(a), 1981a(a)(2), 1981a(b)(2), Defendant is liable Plaintiff for punitive damages.

## SECOND CAUSE OF ACTION
### Disability Discrimination Pursuant to the NYSHRL

87. All preceding paragraphs are incorporated herein by reference.

88. Defendant is an "employer" as defined in N.Y. Exec. Law § 292(5).

89. Plaintiff is an individual with a "disability" as defined in N.Y. Exec. Law § 292(21). Plaintiff has heart disease, which is a physical and medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function and is demonstrable by medically accepted clinical or laboratory diagnostic techniques, and a record of such impairment. Plaintiff's heart disease did not prevent him from performing in a reasonable manner the activities involved in CSO position. Alternatively, Plaintiff had a condition regarded by Defendant as such an impairment.

90. Pursuant to N.Y. Exec. Law § 296(1)(a), Defendant was prohibited from discriminating against Plaintiff because of his disability.

91. By *inter alia,* removing Plaintiff from duty because of his disability, terminating Plaintiff because of his disability, and requiring Plaintiff to submit additional information about his disability and take multiple stress tests, Defendant discriminated against Plaintiff because of his disability in violation of N.Y. Exec. Law § 296(1)(a).

92. Because Defendant discriminated against Plaintiff because of his disability, pursuant to N.Y. Exec. Law § 297(9), Defendant is liable to Plaintiff for back pay, front pay, compensatory damages, and punitive damages, and pursuant to N.Y. Exec. Law § 297(10), Defendant is liable to Plaintiff for attorney's fees and costs.

### THIRD CAUSE OF ACTION
### Disability Discrimination Pursuant to the NYCHRL

93. All preceding paragraphs are incorporated herein by reference.

94. Plaintiff is a "person" as defined in N.Y.C. Admin. Code § 8-102.

95. Defendant is an "employer" as defined in N.Y.C. Admin. Code § 8-102.

96. Plaintiff is an individual with a "disability" as defined in N.Y.C. Admin. Code § 8-102. Plaintiff has heart disease, which is a physical and medical impairment of the cardiovascular system, and a record of such impairment. Alternatively, Defendant perceived Plaintiff as having a "disability" as defined in N.Y.C. Admin. Code § 8-102.

97. Pursuant to N.Y.C. Admin. Code § 8-107(1)(a), Defendant was prohibited from discriminating against Plaintiff because of his disability.

98. By *inter alia,* removing Plaintiff from duty because of his disability, terminating Plaintiff because of his disability, and requiring Plaintiff to submit additional information about his disability and take multiple stress tests, Defendant discriminated against Plaintiff because of his disability in violation of N.Y.C. Admin. Code § 8-107(1)(a).

99. Because Defendant discriminated against Plaintiff because of his disability, pursuant to N.Y.C. Admin. Code § 8-502(a), Defendant is liable to Plaintiff for back pay, front pay, compensatory damages, and punitive damages, and pursuant to N.Y.C. Admin. Code § 8-502(g), Defendant is liable to Plaintiff for attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against Defendant as follows:

A. Awarding Plaintiff back pay, in an amount to be determined at trial, pursuant to the ADA, NYSHRL, and NYCHRL;

B. Awarding Plaintiff front pay, in an amount to be determined at trial, pursuant to the ADA, NYSHRL, and NYCHRL;

C. Awarding Plaintiff compensatory damages, in an amount to be determined at trial, pursuant to the ADA, NYSHRL, and NYCHRL;

D. Awarding Plaintiff punitive damages, in an amount to be determined at trial, pursuant to the ADA, NYSHRL, and NYCHRL;

E. Awarding Plaintiff attorney's fees and costs pursuant to the ADA, NYSHRL, and NYCHRL;

F. Awarding Plaintiff prejudgment interest pursuant to N.Y. CPLR 5004;

G. Awarding Plaintiff postjudgment interest pursuant to 29 U.S.C. § 1961; and

H. Granting such other relief as this Court deems just.

Dated: New York, New York
March 16, 2020

        KORDER LAW

By: _____
Jacob Korder (JK7008)
Attorneys for Plaintiff
470 Park Avenue South
3rd Floor North
New York, NY 10016
(646) 762-7265
jkorder@korderlaw.com

RAFF & BECKER LLP

By: /s/ Susan E. Salazar
Susan E. Salazar (SS7269)
Attorneys for Plaintiff
Of Counsel to Korder Law
470 Park Avenue South
3rd Floor North
New York, NY 10016
(212) 732-5400
salazars@raffbecker.com